## Citizens Gas Light and Heating Co.

### v.

### Nora O'Brien, Adm'x, etc.

1. STATEMENT.—Appellee's husband was employed by appellant, a firm engaged in the manufacture of illuminating gas, as a laborer, and was told by the foreman to ascend a ladder in the room in which the apparatus was situated, and remove some planks lying upon the iron girders nearly over the superheater; while there deceased became dizzy and fell, receiving injuries from which he died. Appellee brings suit against appellant, and the gravamen of the charge is that by reason of the defective condition and operation of the apparatus, poisonous gases escaped into that portion of the

Citizens Gas Light and Heating Co. v. O'Brien.

room where deceased was negligently directed by the foreman to go, and that his death was caused by inhaling these gases.

2. EXPERT TESTIMONY.—Where physicians were called in as experts, who testified as to what would be the products of the combustion of hard coal in the generator and superheater, and as to the effect these gases would have upon the human system, and the symptoms following their inhalation; and the portions of the apparatus, the number and situation of ventilators, dimensions of the room, etc., having been fully described by other witnesses, hypothetical questions were propounded to these witnesses, the intention of which was to draw out their opinions as to what would have been the condition of the air in the upper part of the building, as to its being impregnated with gases, with the means of ventilation described. *Held*, that the testimony as to the formation of gases, etc., was proper; but the answers to the hypothetical question were inadmissible. An expert must have *experience* as well as *theory* in the matter about which he is called to testify. Although these physicians were skilled in the laboratory and had, in their practice, studied generally the subject of ventilation, none of them had any experience in the use, construction or ventilation of such buildings as the one in question.

3. NEGLIGENCE.—If an employe, by his disobedience of the orders of the foreman, increased his risk, and thereby contributed to his own injury, it would be a question for the jury to determine, under proper instructions, whether his negligence was slight, and that of the defendant gross in comparison therewith.

APPEAL from the Circuit Court of McLean county; the Hon. O. T. REEVES, Judge, presiding.    Opinion filed October 3, 1884.

Messrs. KERRICK, LUCAS & SPENCER, for appellant; that it was error to permit the so-called experts to testify as experts upon the subject of ventilation without showing any peculiar knowledge or skill upon that subject, cited Beach v. Kirk, 11 N. H. 397; Heald v. Thing, 45 Me. 392; Clark v. Bruce, 19 Hun, 274; Rogers on Expert Testimony, 22; C. & N. W. Ry. Co. v. Adams, 108 Ill. 577; Hopkins v. Ind. & St. L. R. R. Co., 78 Ill. 32; Hamilton v. Des Moines R. R. Co., 36 Ia. 31; Muldowny v. Ill. Cent. R. R. Co., 36 Ia. 702.

Mr. JOHN T. LILLARD, for appellee; as to the competency of the expert witnesses, cited Hyde v. Bacon, 1 Ia. 159; State v. Hinkle, 6 Ia. 380; Rogers on Expert Testimony, §§ 16–17; Jones v. Tucker, 41 N. H. 546; Dale v. Johnson, 5 N. H. 546;

Hill v. Home Ins. Co., 129 Mass. 345; Tucker v. Mass. Cent. R. R. Co., 118 Mass. 546; Swan v. Middlesex, 101 Mass. 173; Lawrence v. Boston, 119 Mass. 126; Lawton v. Chase, 108 Mass. 238; Ardesco Oil Co. v. Gilson, 63 Penn. 146; Del. Steamboat Co. v. Storrs, 69 Penn. 36; Gay v. First German Congregation, 63 Penn. 156; Howard v. Providence, 6 R. I. 516.

McCulloch, J. This was a suit by appellee against appellant to recover damages resulting to her from the death of her husband, which she alleges was caused by the negligence of appellant, under the following circumstances. Appellant is the owner of a building intended to be used for the manufacture of illuminating gas by means of a certain apparatus manufactured by A. O. Granger & Co. This firm had about completed their contract for putting in the works, and had made one test of them on the day preceding that on which the accident happened which resulted in the death of appellee's husband, but had not yet turned the same over to appellant.

The principal parts of this apparatus consist of a generator, located beneath the main floor, and three upright cylindrical chambers of about the height of eighteen feet above the floor upon which they stand. The first of these is called the superheater, the second the condenser, and the third the scrubber. Coal is put into the generator and ignited, the combustion being greatly accelerated by a strong blast of air from a revolving fan. From the generator the smoke and gases, resulting from the combustion of the coal, pass into the superheater, where they are met by another blast of air from the fan, whereby the combustion is completed. The interior of the superheater is lined with fire bricks, and this process of burning coal is continued until these fire bricks are heated to a white heat, when the chamber is closed against the external air and the process of generating the illuminating gas is commenced. At the top of the superheater is a valve for the escape of the products of combustion during the heating process, but when the process of generating the illuminating gas

is about to commence this valve is closed. The gases produced by the consumption of the coal during the heating process, and which escape through the valve at the top of the superheater, are carbonic acid gas and carbonic oxide, both of which are said to be highly deleterious to human life when inhaled into the lungs.

For several days prior to the day in question a slow fire had been kept burning in the generator for the purpose of drying out the lining of fire bricks in the superheater. On the day next preceding that of the accident, the works had been started and a small quantity of illuminating gas manufactured. The draft had been shut off from the generator about five o'clock in the afternoon, leaving in it a bed of partially consumed coal in an ignited condition, and the valve at the top of the superheater open. It remained in that condition over night, so that if any noxious gases were generated during that time they had free access to the upper part of the building. The fact that there was no draft of air through the generator would render combustion very slow and the escape of gases through the valve correspondingly diminished.

The building consisted of a brick wall with numerous windows and doors, and a slate roof supported by an iron frame. The roof was pierced with three openings, of the diameter of twenty and twenty-four inches respectively, for ventilating purposes. The intention was to place a pipe with a funnel-shaped mouth, opening downward, and projecting through the roof, directly over the valve at the top of the superheater to carry off what was emitted therefrom, but it had not yet been placed in position.

On the day in question, Mr. Odell, the agent of Granger & Co., was yet in charge of the apparatus for manufacturing gas, while one Burns, the superintendent employed by the appellant, had charge of the building and the works generally, and had the control of nearly if not all the men employed about the same. A few minutes before noon on that day Odell had the engine started with the intention of making another trial of the apparatus, but the blast had not yet been started through the generator. Some fresh coal had been put in

during the forenoon, but the fire had not been started up, so that it appears the works were nearly in the same condition they had been during the night.

Some planks were lying upon the iron girders nearly over the superheater. Fearing these might take fire Burns sent the deceased, who was in appellant's employment as a laborer, and one Clark to remove them. Deceased ascended by a ladder to the top of the condenser, and then taking hold of the iron girder, which was higher than his head, swung himself up to where the planks were. In the meantime Clark had taken off his coat and had gotten part way up the same ladder. Looking up he saw the deceased swing himself down to the top of the condenser. After standing there for a few moments he tottered and fell to the brick floor and received the injuries from which he died.

The gravamen of the charge is that by reason of the defective condition and operation of such apparatus poisonous gases escaped into that portion of the room where the deceased was directed to go; that Burns negligently directed the deceased to go there; that he was overcome by inhaling the said gases and fell to the floor, receiving the injuries from which he died; that appellant knew, or might by the exercise of reasonable care have known of the presence of such gases, but that the deceased did not know of the same although he was in the exercise of reasonable care.

, There was no attempt to prove the presence of any of the illuminating gas in the building, but the proof was confined wholly to that which escaped through the superheater valve as the product of the combustion of the coal.

The presence of gas is attempted to be proved by the action of the deceased. Immediately after reaching the place where his work was to be done he left without accomplishing the object of his mission. Clark says he spoke to him but received no answer; that deceased looked overcome and "sorter" dizzy; that he went to sit down, his knees began to quiver and he went over backward. Joe Kirby, a boy eleven years old, the only other witness who saw him fall, says he had his hands clasped around the boards; that he swung and let go when in

the center of the condenser; tried to bend his knees a little; tried to get hold of the ladder, and fell; that Clark did not say anything, but hallooed when O'Brien fell; that deceased did not speak but made a little groan just before he fell, and that he fell forward.

Clark also testified that when on the ladder he smelled some gas; that the superheater valve was open; the wind was on the blower, and that flame and sparks were issuing from the valve. His testimony is somewhat invalidated by the testimony of other witnesses, who ascended the ladder very shortly afterward and smelled no gas, and of others who overwhelm him upon the subject of the blast having been turned on the fire.

It is not contended that these noxious gases were afloat in sufficient quantities in the lower portion of the building to endanger life. Nor is there any evidence that Burns or any other agent of appellant had actual notice of their presence above. Burns, on the contrary, testifies he had no knowledge whatever they were there.

It is contended, however, that Burns, being a man of experience in the manufacture of gas and in the use of apparatus similar to this, if in the exercise of reasonable care would have known of the presence of these gases at the place to which he sent the deceased to work, and that his failure to inform himself thereof was culpable negligence, for which appellant is liable.

Two points were necessary to make out appellee's case. First, that the deceased met his death by reason of poisonous gases at the place where Burns had sent him to work; secondly, that Burns was guilty of negligence in not detecting their presence.

Some stress is laid, in the argument, upon the fact that the escape pipe had not been placed above the valve of the superheater, and that in consequence thereof the gases were permitted to accumulate in the upper part of the building. On the other hand it is contended that if there was any negligence in that, it was the fault of Granger & Co. and not of appellant. We can not see how it becomes material in this

case to decide through whose fault it was that the gases were permitted to accumulate. The complaint is that Burns sent the deceased, who was ignorant of the situation, into a place of known danger. The construction of the building, the situation of the apparatus and the manner of its use may, if brought home to the knowledge of Burns, be circumstances tending to show that he ought to have known of the situation above, but the cause of action is the negligence of Burns in sending the deceased to work where he (Burns) ought to have known there was danger.

Upon the question of the presence of gas in the upper part of the building, appellee's counsel were not content to rest their case upon the testimony of Clark alone. He testified that when part way up the ladder he smelled gas, but other witnesses in as good a situation for observation as he, were prepared to testify they smelled none. Clark had testified that the blast had been turned into the generator, and that it was driving the blaze and sparks out through the superheater valve and making a very loud noise, while other witnesses were prepared to contradict him upon these very material points.

Counsel therefore called in, as experts, three witnesses learned in the science of chemistry. These witnesses all testified that the products of the combustion of hard coal in the generator and superheater would be carbonic acid gas and carbonic oxide; that the specific gravity of the former was greater, and that of the latter less, than the specific gravity of common air; that while both of them would mix with common air, the tendency of the former was to descend and of the latter to ascend; that both were highly poisonous, but the latter much more so than the former, and that large quantities of these gases would be driven through the superheater valve when the blast was on. These witnesses were all physicians in good standing and testified to the effect such gases would have upon the human system, and the symptoms following their inhalation when breathed separately or in a mixed state.

This line of investigation was properly within the province

of expert testimony. If it could be shown that the combustion of coal in the generator and superheater would produce two poisonous gases; that both of them would to some extent mix with and diffuse themselves through the mass of air in a room, but that the more dangerous of the two would incline to the upper part of the room, while the tendency of the other would be to settle to the floor; that the inhalation of one or both of them was likely to be followed by certain symptoms; that the deceased had been exposed in a place where such gases would, under the circumstances in proof, be likely to be found; that immediately thereafter he was seen to exhibit such symptoms, the jury could fairly conclude that such gases were then and there present.

The scientific knowledge thus imparted to the jury would form the connecting link in the testimony by which a certain known effect would be traced to its proper cause. The principles of science being thus brought to bear upon the facts testified to by witnesses who had learned the same from observation, the jury would be enabled to arrive at a proper conclusion.

But it is exclusively the province of the jury to draw their own conclusions from the evidence before them. Witnesses should not be permitted to perform that office for them. We are not aware that any rule can be laid down in general terms whereby the limits may be defined beyond which experts may not go in giving an opinion to the jury. Their duty is to give evidence; not to decide the case on trial. It is for the court to allow the witness to testify so long as his testimony tends to establish the matters in issue, but the court should arrest the inquiry whenever it would place the witness in the place of the juror.

When tested by these principles, we are of opinion that portions of the testimony of these witnesses was improperly received. The premises had been somewhat fully described by other witnesses as to the location of the different portions of the apparatus, the height of its several parts, the number of doors and windows in the building, the number, size and construction of the ventilators, dimensions of the room, etc. In-

terrogatories were then propounded to each of these witnesses based upon a hypothetical state of facts assumed to have been established by the testimony of other witnesses, the intention of which was to draw out their opinions respectively as to what would have been the condition of the air in the upper part of the building, as to its being impregnated with gases, with the means of ventilation described. We select one of these questions put to Dr. Mason as an example.

Q. Doctor, if the roof of the building, taking this apparatus as eighteen feet high (showing plat), the distance over the apparatus to a line from the top of a brick wall seven feet more, fifteen feet from that point to the cone of the roof, building somewhere about thirty-four by thirty-six, with a round opening in the center of the roof twenty-four inches in diameter, with a cap over it, with a head to the cap open four inches wide under the cap, so the gases will pass out, two other ventilators constructed in like manner in a room of that size, with this generator here, with three hundred pounds of coal in it in a state of combustion, what would in your judgment be the condition of the air as to being impregnated with these gases, with what means of ventilation and a supply of these gases as described?

To this question the witness made the following reply: "Taking the situation of the building as stated, there would be some gases in the upper part of the room; gas would tend to diffuse itself about the room."

The question whether or not there were any such gases in the upper part of the room was a vital question in the case. Now if this witness had been sitting by and had heard all the testimony that had gone before, and had he then been called upon to testify what his opinion was as to the presence of these gases, and had he then given an opinion in favor of their presence, he would not have more effectually usurped the functions of the juror than he did in the answer given.

In that case he would have had in his mind's eye all the facts testified to by the witnesses who had preceded him, and from such facts he would have made up his opinion; whereas, in this instance, he was called upon to give his opinion upon

one of the principal issues in the case, based upon a partial and hypothetical statement of the facts as they were assumed by appellee's counsel to have been proved by other witnesses.     His judgment in the case we have supposed, would have been much more reliable·than in the case before the jury; and no judicial mind could in such case ever sanction the practice of allowing a witness to give his judgment or opinion as to the existence of a fact in issue drawn from the testimony of other witnesses.     That would be plainly to substitute the judgment of the witness for that of the juror.

Another objection to this class of testimony exists in the fact that the witnesses are not shown to have had any special knowledge, skill or experience in regard to one subject upon which they were called upon to express an opinion.     To make the opinions of experts admissible, it is necessary that the subject-matter of inquiry should be within the range of the peculiar skill and experience of the witness, and one of which the ordinary knowledge and experience of mankind does not enable them to see what inferences should be drawn from the facts.     Rogers on Expert Testimony, p. 13; Hopkins v. Indianapolis & St. Louis R. R. Co., 78 Ill. 32; C. & N. W. Ry. Co. v. Adams, 108 Ill. 577; Hamilton v. Des Moines· R. R. Co., 36 Iowa, 31; Muldoway v. Ill. Cent. R. R. Co., 36 Iowa, 702.     However learned or experienced they may have been in the line of their profession, or in the science of chemistry, yet that does not qualify them for expressing their opinion upon matters altogether beyond and outside the range of their peculiar skill, experience or reading.     If, as they testified, the tendency of carbonic oxide is to ascend to the upper part of the building, it would follow that, like the more rarified air, it would seek an outlet through the ventilators; the rapidity of its escape would depend somewhat upon the temperature inside the building as compared with that outside of it, as well as by the condition of the doors and windows, as to whether they were open or not.     It would also depend somewhat upon the velocity and direction of the wind, the size and construction of the ventilators and many other circumstances which might occur to one accustomed to

be about such buildings. The quantity of the gas in the building would, under these varying circumstances, also depend upon the length of time that had elapsed since the blast had been shut off, and whether or not any fresh coal had afterward been added. One versed in the science of physics might guess at it, but jurors are sometimes as good guessers as the most eminent scholars.

Dr. Mason's testimony is that he had to some extent investigated the question of ventilation; that it is involved in his study, practice and teaching; that he had made observations for quite a number of buildings in connection with public school buildings, and in answer to a question by the court if he would consider himself competent for the ventilation of any building, answered that he had undertaken it.

Dr. Dyson testified that he had not given the question of ventilation much attention; that he had a general idea upon the subject, but had not made it a specific study.

Dr. Taylor was not examined as to his competency as an expert upon this question, and but few questions were put to him touching the same.

We would not be understood as saying that persons who are in the habit of being about such buildings might not have acquired such a special knowledge of the requirements necessary to good ventilation and the removal of gases that might accumulate therein, as to enable them to testify as experts. Buildings erected for special purposes, such as gas works, foundries, breweries, paper mills and the like, may require the adoption of certain appliances for their proper ventilation which would be wholly unnecessary or unadapted to the ventilation of dwellings, stores, churches or schoolhouses. Men learned in the sciences may testify concerning the laws which govern the circulation and diffusion of deletereous gases, but it oftentimes requires a careful study of the construction of the building itself in determining what effect these laws have in a particular instance. The members of this court have been made painfully aware of this fact by the escape of the product of burning gas from the fireplace into their conference room. A flue is placed in the wall to carry it off, and

Citizens Gas Light and Heating Co. v. O'Brien.

according to the laws of nature, as taught by books of science, this flue ought to perform its office without fault. But it is found by experience that under certain conditions of the atmosphere in the great dome that overtops the building, the action of this flue, as well as many others like it, is exactly the reverse of what it should be. Men of science who had never seen the building might puzzle their wits a long time to find out the cause of this, but the superintendent of the heating apparatus can explain it in an instant; and his explanation is perfectly consistent with the operation of that law which science would tell us should carry the products of the burning gas out through the flue in the wall. In a case like that the experience of the superintendent would prevail over the theories of science based upon a partial statement of facts, and yet when science has taken hold of all the facts the whole matter is readily and easily explained.

This illustration serves the purpose of giving point to the rule that requires one to have experience, as well as theory, in the matter about which he is called to testify as an expert. The witnesses in this case were no doubt eminent in their profession and skilled in the work of the laboratory, but none of them had any experience in the construction, use or ventilating of such buildings as the one in question. We are therefore of the opinion they were incompetent to give their opinions upon the subject-matter inquired of them.

Fire had been burning in the generator for some days and no doubt as great a quantity of these noxious gases had been emitted through the superheater valve during that time as on the day of the accident. No attempt was made to prove their presence there before that time or that Burns had any knowledge thereof. Could it be shown that he knew of the presence of these gases at the place in question on other days preceding, that might be an additional circumstance to charge him with notice of their presence on the day of the accident. But there are so many conditions, the existence or non-existence of which might give color to the occurrence, that to allow the opinions of witnesses who had never seen the building to go before the jury as a matter of evidence upon one of

the main points in issue by which their verdict might be controlled, is error of a very grave character.

It is said that appellee ought not to recover because the deceased disobeyed the instructions of his foreman, Byerly, in the manner of his getting up to where the planks were lying. We can not say as a matter of law that this is so. If he, by his disobedience of orders, increased his risk, and thereby contributed to his injury, it would be a question for the jury to determine, under proper instructions, whether his negligence was slight and that of the defendants gross, as defined by numerous adjudicated cases.

Some criticism is indulged in as to some of the instructions given upon the part of appellee. Some of them are not wholly free from the objections taken, but they are of slight importance, and can be corrected on another trial without any further suggestion from us. But for the admission of improper testimony the judgment of the circuit court will be reversed and the cause remanded.

Reversed and remanded.